Loran RECKER and Mary Recker,
Appellees,

v.

Alvin GUSTAFSON and Irene
Gustafson, Appellants.

No. 63047.

Supreme Court of Iowa.

May 30, 1979.

Rehearing Denied July 20, 1979.

John H. Ehrhart and William D. Martin of Fisher, Yarowsky, Martin, Ehrhart & Redmond, Cedar Rapids, for appellants.

R. L. Donohue of Donohue Law Office, West Union, for appellees.

Considered by LeGRAND, P. J., and REES, UHLENHOPP, McCORMICK and McGIVERIN, JJ.

McGIVERIN, Justice.

This appeal involves several issues arising from an oral land contract dispute. Trial court ordered specific performance in favor of the plaintiff vendees. We modify and affirm.

We dismissed as premature a prior appeal by defendants. *Recker v. Gustafson,* 271 N.W.2d 738 (Iowa 1978). After district court judgment on September 23, 1977, plaintiffs filed a motion to enlarge pursuant

to Iowa R.Civ.P. 179(b). Subsequent to the motion, but prior to ruling thereon, defendants filed notice of appeal. *Id.* at 738–39. The case was returned to district court which ruled on plaintiffs' post trial motion under Iowa R.Civ.P. 179(b). Defendants again appeal and plaintiffs cross-appeal.

I. *Background facts and proceedings.* Defendants Alvin and Irene Gustafson, husband and wife, are owners as tenants in common of a 160 acre farm in Fayette County, Iowa, where they have lived for several years. Plaintiffs Loran and Mary Recker, also husband and wife, have been interested in purchasing the farm. Alvin was age 72 and Loran was age 23 at time of trial. Alvin had been a licensed real estate broker for 20 years but has not actively practiced for the past ten years.

A. *The first agreement.* After some preliminary negotiations, the parties met on August 30, 1976 in the office of Gustafsons' attorney, John W. D. Hofmeyer, in Fayette to discuss the sale of the farm. Reckers were not represented by an attorney in the negotiations. The 160 acre farm includes a five acre tract upon which various buildings, including the Gustafsons' home, are located.

As supported by the testimony of both Loran Recker and attorney Hofmeyer, the parties reached an oral agreement on various specific terms of sale: a 155 acre tract, not including the five acre site on which the buildings were located, was to be sold for $290,000 with a $40,000 down payment on date of possession, which was to be March 1, 1977; annual payments were to be $28,000, including principal and interest, based on a ten-year contract with one final balloon payment at the end of the contract by March 1, 1987; interest was to be 7½% per annum on the unpaid balance; and there was to be no deficiency in the event of forfeiture of the contract. In addition, Gustafsons were to pay the 1977 realty taxes with Reckers assuming taxes after possession on March 1, 1977.

Settlement was to be made at the Oelwein State Bank. It was agreed that the contract would be drafted for execution on an Iowa State Bar Association form which called for a warranty deed and certified abstract of title showing merchantable title in the sellers. Reckers were to receive clear title to the land as tenants in common.

Relative to the five acre building site, the parties agreed Gustafsons were to continue to own the tract until they provided a notice of sale to Reckers, who then would have 45 days to exercise a right to buy the five acres for $30,000 plus compensation for any subsequent improvements. Other details concerning the five acres also were agreed upon.

Alvin and Loran agreed to measure the five acre tract and turn the figures over to attorney Hofmeyer so he could draft a sufficient description of the real estate. After the August 30 meeting, Loran went to Gustafsons' farm. Alvin had already marked the corners of the five acre tract that Gustafsons were going to retain out of the 160 acres. Alvin showed Loran the point of beginning in his yard which was related to a legal known point in a nearby road. From this beginning point Alvin showed his measurements and boundaries on the five acres to Loran, who agreed after checking the measurements. Thereafter, Alvin delivered a sketch or diagram showing the measurements of the retained five acres to Hofmeyer's office to enable Hofmeyer to include a legal description of the building site in the written contract.

The diagram, referred to as Exhibit E, was produced from attorney Hofmeyer's file when he testified at trial. Defendants objected to introduction of the diagram on ground of attorney-client privilege; plaintiffs claimed the privilege had been waived. Although the case was tried in equity, the court observed defendants' objection was well taken.[1]

---

1. Although the parties do not address the admissibility of the diagram as an issue in this appeal, we note the diagram was properly admissible at trial and properly considered by us here. To support a valid claim of attorney-client privilege we have said "there must exist an attorney-client relationship and the communication, to be protected, must have been made

At the close of the August 30 meeting, Loran, in the presence of Irene, tendered to Alvin a check for $5,000 bearing the notation "ernest [sic] money for farm." Alvin accepted the check and deposited it in a joint bank account to which both he and Irene had access.

At trial, attorney Hofmeyer testified that, in his opinion, an agreement had been reached and the "farm was sold."

Upon conclusion of the August 30 meeting the parties agreed to reduce the terms to writing, which was to be signed at a later date. Hofmeyer had begun to work on the written contract when he received a call from Irene Gustafson instructing him not to complete the contract. No written contract was ever completed or signed.

B. *The second "agreement."* At Hofmeyer's request, on September 20 another meeting was held in Hofmeyer's office with all parties present. Terms of the August 30 oral agreement were varied in two respects. First Reckers agreed to pay an additional $10,000 for the 155 acres. Second Reckers agreed to the right of first refusal at whatever price Gustafsons desired to set in the event Gustafsons decided to sell the five acre building site. Reckers no longer would have the right to buy the five acres for $30,000 plus cost of improvements.

Prior to agreeing to these less favorable terms, Reckers were told by Hofmeyer that Gustafsons were willing to go to court to get out of the August 30 agreement and that litigation was expensive. Hofmeyer also stated that, if Reckers agreed to the changes, Gustafsons would go through with this second agreement.

Other terms of the sale remained unchanged. The initial payment of $5,000 continued to be computed as part of the $40,000 down payment.

Hofmeyer, again, was instructed to prepare a written contract.

C. *Later developments.* In a letter dated September 28 Reckers were notified by attorney Hofmeyer that Gustafsons had "decided not to sell the farm." Enclosed was a cashier's check for $5,000.

On October 21 Reckers filed an equity petition seeking specific performance of the August 30 oral agreement and "such other equitable relief as may be proper."

In answer, Gustafsons alleged: that they had not entered into any contract with Reckers; that Reckers abandoned the August 30 agreement and entered into a new agreement on September 20; that the realty was defendants' homestead and there was no written instrument pursuant to section 561.13, The Code, and therefore, the alleged contract to convey was invalid; and that evidence of the purported agreement to convey was incompetent under section 622.32, The Code.

Irene Gustafson, separately, denied receipt of $5,000 from Reckers.

After trial, the court's decree concluded the August 30 contract was modified by the September 20 agreement. The court ordered that Reckers were entitled to specific performance of the modified contract for the purchase of the 155 acres:

at a total price of $300,000.00, of which $40,000.00 is to be paid down, the balance to be paid over a ten-year period, in equal yearly payments of $28,000.00, including principal and interest, with interest at 7½ % per annum. The possession is to be transferred effective as of March 1, 1977, which would mean that defendants will have to account to the plaintiffs for the rentals during the cropyear of 1977. The defendants are to pay for the taxes for the use of the property in 1976, and to pay all taxes during the calendar year of 1977. The defendants are to furnish the plaintiffs an abstract of title, showing merchantable title in and to the above-described real estate; that the real estate is

in confidence." *Bailey v. Chicago, Burlington & Quincy Railroad,* 179 N.W.2d 560, 564 (Iowa 1970). Because the diagram simply illustrated the description and measurements of the five acre tract as previously shown to and approved by Loran Recker, the communication was not made in confidence. Writings not otherwise privileged do not become privileged by turning them over to an attorney. 3 *Jones on Evidence* § 19.18, at 577 (6th ed. 1972).

to be purchased by the plaintiffs as tenants in common; that the evidence shows by a preponderance of clear, satisfactory and convincing evidence that the terms of the contract, made on August 30, 1976, were modified by the subsequent agreement held in the latter part of September 1976, and that the sale only includes the 155 acres, and does not include the 5-acre building site.

Gustafsons appealed, claiming no enforceable contract was formed. Reckers cross-appealed, contending the court should have ordered specific performance for sale of 155 acres, excluding the homestead, pursuant to the August 30 agreement.

II. *The issues.* Although the parties state them in other ways, we believe the following issues are presented for our review in arriving at disposition of the case:

(1) Whether the August 30 oral agreement between Gustafsons and Reckers falls within the statute of frauds, section 622.32, The Code;

(2) Whether the August 30 agreement is taken out of the statute of frauds because Loran Recker paid Alvin Gustafson $5,000 of the purchase money which Alvin deposited in a joint checking account to which his wife had access;

(3) Whether an enforceable oral contract was formed between the Gustafsons and Reckers on August 30;

(4) Whether specific performance of the oral contract is prohibited in whole or in part by section 561.13, The Code, where the land includes the home and farm buildings of Gustafsons;

(5) Whether the September 20 agreement is enforceable and effective to alter the August 30 agreement; and

(6) Whether specific performance is an appropriate remedy here.

■ The scope of our review is de novo. Iowa R.App.P. 4; *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977).

In equity cases, especially when considering the credibility of witnesses, the court gives weight to the fact findings of the trial court, but is not bound by them. Iowa R.App.P. 14(f)(7); *Severson,* 250 N.W.2d at 420.

III. *The August 30 agreement as an oral contract.* We consider the first three issues together because of their dependent nature.

To determine whether the oral negotiations between the Gustafsons and Reckers resulted in a valid oral contract of sale of the Gustafsons' land, we initially must consider whether the oral negotiations fall within the statute of frauds.

■ A. *Applicability of the statute of frauds.* At trial Gustafsons objected to evidence concerning the August 30 oral agreement on the ground that such evidence was incompetent under the statute of frauds. § 622.32, The Code 1975. The clear language of the statute applies to the Gustafson-Recker negotiations for sale of the Gustafson farm.

Section 622.32 provides in relevant part: Except when otherwise specifically provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent:

.    .    .    .    .

3. Those for the creation or transfer of interests in lands, except leases for a term not to exceed one year.

We have long held that contracts for sale of land fall within the bounds of the statute of frauds. *See Fairall v. Arnold,* 226 Iowa 977, 988, 285 N.W. 664, 668 (1939).

■ "Our statute does not forbid oral contracts or render them invalid. It relates merely to the manner of proof." *In re Estate of Lindsey,* 254 Iowa 699, 710, 118 N.W.2d 598, 605 (1962). *See Johnson v. Ward,* 265 N.W.2d 746, 747–48 (Iowa 1978); *Davis v. Davis,* 261 Iowa 992, 1003, 156 N.W.2d 870, 877 (1968). The impact of the statute of frauds, therefore, is not to void the contract but to render incompetent oral proof of its existence.

Determination that the statute of frauds is applicable, however, does not end our inquiry. The statute of frauds is subject to

statutory exception where there has been payment of purchase money. § 622.33. *Cf. Miller v. Lawlor*, 245 Iowa 1144, 66 N.W.2d 267 (1954) (statute of frauds subject to exception under promissory estoppel). We must, therefore, examine the relevance of the statutory exception to the statute of frauds doctrine.

B. *Statute of frauds exception.* In determining the applicability of section 622.33 we must decide both whether the payment of the $5000 check constitutes payment of a portion of the purchase price and whether payment to Alvin, alone, constitutes payment to the vendors.

■ 1. *Payment of the $5000 by Reckers.* The statutory exception to the statute of frauds is set out in section 622.33, which provides in part:

> The provisions of subsection 3 of section 622.32 do not apply where the purchase money, or any portion thereof, has been received by the vendor . . . .

The term "purchase money" has been defined by case law. In *Devin v. Himer*, 29 Iowa 297 (1870), we defined purchase money to mean "consideration." *Id.* at 299. The consideration, itself, may take one of many forms. *Cf. Mitchell v. Colby*, 95 Iowa 202, 63 N.W. 769 (1895) (consideration consisting of attorney's litigation services); *Harlan v. Harlan*, 102 Iowa 701, 72 N.W. 286 (1897) (consideration consisting of care for enfeebled relative); *Daily v. Minnick*, 117 Iowa 563, 91 N.W. 913 (1902) (consideration consisting of permitting grantor to name a newborn infant); *Williams v. Chapman*, 242 Iowa 294, 46 N.W.2d 56 (1951) (consideration consisting of possession and improvement of property as well as provision of care for grantor).

In *Rohrbach v. Hammill*, 162 Iowa 131, 143 N.W. 872 (1913), we reviewed a case, arising under the statutory predecessor to section 622.33, in which an oral contract was claimed taken out of the statute of frauds through tender and receipt of a check for the full amount and bearing the notation "earnest money." Noting that parol evidence is competent to establish the agreement "where it is shown that any portion of the purchase money is paid," we said:

> [W]e will consider the words "purchase money," as used in the statute, as synonymous with the word consideration, and the consideration may be anything of value delivered by the one party to the other, which is accepted as a part of the purchase price of the thing sold.

*Id.* at 138, 143 N.W. at 874. In applying this principle we held the contract was taken out of the statute of frauds by the tender and acceptance of the check, which was never actually cashed. *Id.* at 141, 143 N.W. at 875–76. *Cf. Throckmorton v. Davidson*, 68 Iowa 643, 27 N.W. 794 (1886) ($20.00 cash payment on $2,400 purchase money binding to remove contract from statute of frauds). *But cf. Ormsby v. Graham*, 123 Iowa 202, 98 N.W. 724 (1904) (check payment to sellers' agent not binding to remove contract from statute of frauds where sellers were unaware of the transaction).

We reached a similar result in *Luse v. Elliott*, 204 Iowa 378, 380–81, 213 N.W. 410, 411 (1927), where we relied on payment of $100 on a $30,000 sale price to take a contract out of the statute of frauds.

The parties do not dispute that Loran Recker tendered Alvin Gustafson a check for $5000, which Alvin accepted and cashed. Nor do the parties dispute that the $5000 was applied toward the purchase price. Under authority of both *Rohrbach* and *Luse*, the $5000 payment falls within the purview of section 622.33 and takes the oral contract out of the statute of frauds, section 622.32.

Although section 622.33 appears otherwise applicable, the Gustafsons argue the fact that the check was made out in the name of Alvin, accepted by him and deposited by him omits Irene Gustafson from the transaction and thereby fails to remove the contract from the statute of frauds. While this argument is ingenious, it is not persuasive.

2. *$5000 payment as binding on Irene Gustafson.*

■ Although defendants claim that Irene Gustafson is not bound through receipt, endorsement and deposit of the $5000 check by *Alvin*, it is undisputed that the check was deposited in the Gustafsons' joint checking account. Ownership of bank deposits is determined under contract law. "It is well established that a depositor may create a joint tenancy with a third person donee-beneficiary by his contract with the bank." *Petersen v. Carstensen*, 249 N.W.2d 622, 624 (Iowa 1977). Physical receipt, endorsement and deposit, therefore, is not determinative of ownership of the $5000 earnest money.

Section 622.33 requires the purchase money be "received by the vendor." Since the $5,000 check was deposited in Irene's joint account after negotiations in which she took an active part, we decline to hold that the statutory requirement has not been satisfied. Both Alvin and Irene Gustafson have "received" a portion of the purchase money pursuant to section 622.33. The negotiations, therefore, are taken out of the statute of frauds.

C. *Evidence of the oral contract.* Having decided that evidence of the August 30 agreement was not subject to objection under section 622.32, we must consider whether the oral negotiations resulted in an oral contract for sale.

■ Where specific performance of an oral agreement affecting real estate is sought, plaintiffs have the burden to prove the contract by a preponderance of clear, satisfactory and convincing evidence. *Severson*, 250 N.W.2d at 420; *McCarter v. Uban*, 166 N.W.2d 910, 912 (Iowa 1969). *See Anderson v. Armstrong*, 264 N.W.2d 619, 621 (Iowa App. 1978).

Our most recent analysis of the formation of oral contracts is found in *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d at 420–21. In *Severson* we reviewed an oral contract for the sale of the physical assets of a grain elevator. Articulating the standard for determining whether an oral contract had been formed, we said:

When the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, an oral contract will be upheld unless the parties intended not to be bound until the agreement was reduced to writing. The terms are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance.

*Severson*, 250 N.W.2d at 420 (Citations omitted.)

■ Applying this standard to the *Severson* facts we determined that an oral contract had been formed, despite defendant's assertions that additional and more precise terms would have been included in a final contract. Addressing that argument, we said:

We agree that prudent businessmen might well have acted more wisely than the parties to this transaction. Indeed, this litigation could have been avoided if they had entered the kind of written contract defendant now asserts was then contemplated. However, our decision must be based on what the parties did in fact, not on whether they acted prudently.

*Id.* at 420. *See McCarter*, 166 N.W.2d at 912–13: Although the Gustafsons now recite a variety of topics not resolved under the alleged oral contract, the terms of an agreement to sell the land were definitely fixed. More precision, perhaps, would have been prudent. However, as stated in *Severson*, prudence of the parties does not govern our decision.

Even though the terms of an agreement may be definitely fixed, an oral contract will not be upheld if the parties did not intend to be bound until the agreement was reduced to writing. The intention of the parties must be "gleaned from the facts of the case." We have said the factors to be considered in determining whether the parties intended to be bound before execution of a written agreement include:

whether the contract is of a class usually found to be in writing, whether it is of a type needing a formal writing for its full expression, whether it has few or many

details, whether the amount is large or small, whether the contract is common or unusual, whether all details have been agreed upon or some remain unresolved, and whether the negotiations show a writing was discussed or contemplated. *Severson,* 250 N.W.2d at 421. While it must be conceded by Reckers that contracts for sale of land are usually found to be in writing, *see* section 622.32, that the amount of money involved was large and that a subsequent writing was contemplated by the parties, other circumstances indicate the parties intended to be bound by the oral agreement.

Alvin Gustafson's behavior at the August 30 oral negotiations and thereafter was consistent with that of a man who believes he has sold his property. Gustafson, himself a licensed real estate broker, accepted a check with the notation "ernest [sic] money for farm," and deposited it into his checking account. Thereafter, Alvin met with Loran on the Gustafson farm to measure off the building site. Alvin also told Loran's mother that Loran had purchased the Gustafson farm. Furthermore, in discussion with the tenant farmer of the Gustafson property, Gustafson stated he would not rent the property in the event that it were sold. Subsequently, the tenant farmer received a written notice to terminate. A new farm lease was signed, however, after the business relationship between the Gustafsons and the Reckers broke down.

We conclude the August 30 oral negotiations resulted in an oral contract for the sale of the land.

IV. *Effect of section 561.13, The Code, on enforcement of the oral contract.* In addition to section 622.32, oral contracts for sale of homestead property are subject to section 561.13, The Code, which provides in part:

No conveyance or encumbrance of, or contract to convey or encumber the homestead, if the owner is married, is valid, unless the husband and wife join in the execution of the same joint instrument, and the instrument sets out the legal description of the homestead, pro-

vided however that where the homestead is conveyed or encumbered along with or in addition to other real estate it shall not be necessary to particularly describe or set aside the tract of land constituting such homestead, whether the homestead is exclusively the subject of the contract or not; but such contracts may be enforced as to real estate other than the homestead at the option of the purchaser or encumbrancer. . . .

■ A. *Necessity that contract to convey homestead property be in writing.* Section 561.13 addresses two separate aspects of land transactions involving homestead property. First, a married owner cannot validly convey, encumber, or contract to convey or encumber the homestead unless husband and wife *join in the execution of the same joint instrument.* Second, the homestead property may, or may not, need to be legally described, depending on the conveyance or encumbrance of additional real estate in the transaction. It is the former aspect of section 561.13 which we must consider in the present case.

Although oral contracts, generally, can be taken out of the statute of frauds and specifically enforced, *see* section 622.33, The Code, appellant Gustafsons argue that section 561.13 requires contracts for sale of homestead property always be in writing. Under the Gustafsons' argument, section 561.13 functions as a "special" statute of frauds to which the exceptions applicable to the statute of frauds embodied in 622.32 do not apply. If section 561.13 requires a writing, the oral contract is unenforceable with respect to homestead property. With this background of the issue, we turn to the case law.

In *Clay v. Richardson,* 59 Iowa 483, 13 N.W. 644 (1882), this court ruled an oral agreement by husband and wife to execute a mortgage on their homestead property in security for a loan was not subject to specific enforcement. Citing to section 1990, The Code 1873, the court said "an encumbrance of the homestead is of no validity unless it be based upon a written instrument signed by both husband and wife."

*Id.* at 484, 13 N.W. at 644. Section 1990, The Code 1873, was a predecessor statute to section 561.13, The Code 1975, and provided:

A conveyance or encumbrance by the owner is of no validity unless the husband and wife, if the owner is married, concur in and sign the same joint instrument.

The apparent reliance on the homestead statute to require a written instrument is affirmed by reference to the earlier case of *Barnett v. Mendenhall*, 42 Iowa 296 (1875). Where plaintiff sought specific performance of an oral contract for conveyance of real property which was entered into by the husband alone, and which included the homestead occupied by the defendant's wife and children, the court denied specific performance on a dual basis. The court explained the contract "being the parol agreement of the husband alone is, therefore, of no validity for the double reason that it is not a *joint instrument of writing* concurred in and signed by *both* husband and wife" *Id.* at 299. (Original emphasis). *See Lamb v. Cooper*, 150 Iowa 18, 129 N.W. 323 (1911).

Despite the holdings of *Clay* and *Barnett*, this court has enforced oral contracts for transfer of homestead property under certain circumstances. These cases, however, have dealt with oral contracts to transfer the homestead in return for care and maintenance of the grantor. *Winkleman v. Winkleman*, 79 Iowa 319, 44 N.W. 556 (1890); *Drake v. Painter*, 77 Iowa 731, 42 N.W. 526 (1889).

The rationale of these cases was subsequently explained in *Alvis v. Alvis*, 123 Iowa 546, 99 N.W. 166 (1904), where we said:

The present Code (section 2974), which was in force at the time Mrs. Alvis signed the deed, requires that the wife "must join in the execution of the same joint instrument." Now, we have held that the statute has no application to those cases where an oral contract is made for the transfer of property impressed with homestead rights, it being made to appear that possession and control is given in consummation of such contract. Such are the cases of *Drake v. Painter*, 77 Iowa

[731,] 735, 42 N.W. 526, and *Winkleman v. Winkleman*, 79 Iowa [319,] 323, 44 N.W. 556, cited and relied upon by counsel for appellees. The theory upon which those cases proceed is that by the act of giving over possession and control there is an abandonment of the homestead right. That parties entitled to homestead rights may abandon them, and so divest themselves wholly of such right, is universal doctrine. If, therefore, defendants in this case have brought themselves within the rule of the cases cited, we may without further consideration affirm the decree entered in their favor.

*Id.* at 549–50, 99 N.W. at 167. *See also Robison v. Robison*, 187 Iowa 1209, 175 N.W. 9 (1919).

Since case law upholding oral contracts to convey homestead are based on a theory of abandonment of the homestead, these precedents are not applicable to the present case. There is no evidence that Gustafsons gave possession of their homestead over to Reckers. In absence of the applicability of this exception to section 561.13, the oral contract is invalid insofar as it affects homestead property.

If the contract is invalid insofar as it affects homestead, the question of the extent of the homestead remains to be determined.

█ B. *Limitation of homestead to five acres.* The claim of homestead is a defense to enforcement of oral contracts. *Blankenhorn v. Edgar*, 193 Iowa 184, 192, 186 N.W. 893, 896 (1922). Where the oral contract includes both homestead and non-homestead property, however, a court of equity can enforce the contract in part. § 561.13, The Code 1975; *Lamb v. Cooper*, 150 Iowa at 22, 129 N.W. at 325. Although Reckers argue Gustafsons are estopped from claiming homestead as a defense to enforcement of the entire contract on authority of case law enforcing oral contracts for sale of homestead property, we held the exception to section 561.13 inapplicable to this case in the discussion above. By seeking specific performance of sale of 155 acres, however, Reckers implicitly present

an alternative argument that Gustafsons are estopped from claiming more than five acres as homestead.

The Gustafsons are authorized by section 561.2 to claim as much as forty acres in homestead property.[2] Although the issue is not fully developed in the record, it appears Gustafsons have never selected and recorded a homestead. In negotiation with Reckers and in marking boundaries with Loran Recker, however, Gustafsons have treated the five acre building site as "homestead" property.

■ Because Gustafsons represented the five acre site as their homestead and otherwise entered into a valid contract, they should be estopped from claiming a larger homestead in the event of specific performance as to nonhomestead property. *Cf. Lucas Thompson and Company v. Pickel,* 20 Iowa 490, 494 (1866) (wife estopped from claiming homestead to invalidate mortgage executed by late husband where different forty acre tract had been held out as homestead property).

We have held in other cases that estoppel may bar the raising of the claim of homestead to defeat otherwise valid obligations. *Cf. Ditch v. Hess,* 212 N.W.2d 442 (Iowa 1973) (parties estopped from claiming homestead statute invalidates contract signed by husband in settlement of lawsuit); *Truro Savings Bank v. Foster,* 206 Iowa 432, 220 N.W. 20 (1928) (grantee of deed estopped from challenging validity of prior mortgage).

We hold that Gustafsons are estopped from claiming more than five acres as their homestead as against the claims of Reckers. The legal dimensions of the five acre tract can be ascertained by reference to Exhibit E, the diagram, the dimensions of which were drawn by Alvin and approved by Loran. *See* n. 1, *supra.*

V. *Validity of the September 20 "agreement" and its effect on the August 30 contract.* We next must determine the validity and effect of the September 20 agreement.

On September 20 the parties met in attorney Hofmeyer's office to resolve an apparent dispute over the contract terms governing the five acre homestead building site. During the meeting the parties agreed Reckers were to have a right of first refusal on the building site, rather than an exclusive option with a fixed purchase price, and were to pay an additional $10,000 on the remaining 155 acre tract. All other terms of the August 30 contract remained unchanged.

■ Although the September 20 agreement, like the August 30 agreement, is subject to the statute of frauds, Reckers were to be credited with the previous $5000 payment of a portion of the purchase money toward the $40,000 down payment. We believe this recognition of the previous $5000 payment acts to remove the agreement from the statute of frauds under the reasoning and authorities discussed in division III above.

Because of lack of a writing signed by Gustafsons, the portion of the September 20 agreement relating to the five acre homestead tract was invalid for the reasons and under the authorities discussed in division IV above.

■ Reckers contend the remaining portion of the September 20 agreement calling for a $10,000 price increase on the 155 acres is void for want of consideration. We agree.

The later agreement is insufficient on grounds of lack of consideration, although the parties did "consent" to the September terms. While Gustafsons, through their attorney, warned that, unless Reckers paid an additional $10,000, a court suit would be required to enforce the August 30 agreement, there was no consideration to support the change in purchase price on the 155 acres.

In determining the impact of the September 20 meeting, we turn to general princi-

---

**2.** The forty acre figure is drawn from section 561.2, The Code 1975, which provides that rural homestead "must not contain in the aggregate more than forty acres, but if, in either case, its value is less than five hundred dollars, it may be enlarged until it reaches that amount."

ples of contract law. It is undisputed that an executory contract may be modified or replaced by the parties. In 17 Am.Jur.2d *Contracts* § 459, at 924–26 we find the following:

A contract may be superseded or modified by another contract, in which case the superseded or modified contract is usually referred to as the primary contract and the superseding or modifying contract as a secondary agreement. Thus, the parties to any contract, if they continue interested and act upon a sufficient consideration while it remains executory, may by a new and later agreement rescind it in whole or in part, alter or modify it in any respect, add to or supplement it, or replace it by a substitute.

. . . . .

. . . The original contract generally remains in force except as modified or superseded by the new agreement.

. . .

*See* 6 *Corbin on Contracts* § 1293, 185–99 (1963).

Whether terms of an executory contract are modified or replaced, most jurisdictions require independent consideration to support the new agreement. In regard to contract modification, 17 Am.Jur.2d *Contracts* § 462, at 929–30 states:

Whether performance of a contract by one party or a new promise to perform is sufficient consideration for a new promise by the other party, modifying or replacing terms of the prior contract, is a question on which the authorities differ. According to numerous authorities, a promise of additional performance for the same compensation or to pay additional compensation for the same performance is invalid for want of sufficient consideration, even though further performance is refused unless the new agreement is made, such authorities applying the rule that doing or promising what one is legally bound to do is insufficient consideration for a promise. According to these authorities, a promise to pay additional or greater compensation to a party for doing or promising to do that which he is al-

ready bound by contract to perform is without consideration. It is said that where two parties are under contract with each other, a promise made by one to the other to induce performance is void.

*See* 1A *Corbin on Contracts* § 175, at 114 (1963).

Ascertainment of the Iowa law on the requirement of independent consideration to support a modification or replacement of contract terms is not without difficulty. *See Davenport Osteopathic Hospital Association v. Hospital Service, Inc.,* 261 Iowa 247, 254, 154 N.W.2d 153, 157 (1967) ("[T]here is some degree of confusion as to the necessity of consideration to support a modification . . . ."); Note, 44 Iowa L.Rev. 693 (1959); Hudson, *Doctrine of Consideration in Iowa Revisited—Discharge or Modification of Duties,* 5 Drake L.Rev. 3 (1955).

The Iowa law on sufficiency of consideration to support a modification or replacement of a contract is, at best, confusing. One line of our cases holds that new consideration is necessary to support a modification. In *Meginnes v. McChesney,* 179 Iowa 563, 160 N.W. 50 (1916), this court reviewed the validity of a promissory note for $5,000 given a private nurse by her patient just prior to death. The nurse had been under an employment contract to provide services for a fixed sum per week. Although the patient, apparently, felt under obligation to pay the nurse additional money in view of the inadequacy of compensation previously paid, we held that, "after a contract is fully performed by the parties, a promise to pay an additional sum cannot be enforced" due to a failure of consideration. *Id.* at 576–77, 160 N.W. at 55.

While it appears the completely non-executory nature of the underlying contract justified the failure of consideration, *Meginnes* additionally states:

The doing of that which a party is already under contractual obligation to do will not support a further promise to pay an additional price. *Ayres v. Railway,* 52 Iowa 478, 3 N.W. 522 (1879); *Runkle v. Kettering,* 127 Iowa 6, 102 N.W. 142 (1905).

*Id.* at 576, 160 N.W. at 54. Examination of cited authority shows this court has ruled similarly even when the underlying contract is not fully performed.

In *Ayres v. Chicago R. I. & R. R. R.,* 52 Iowa 478 *aff'd on rehearing* 52 Iowa 491, 3 N.W. 522 (1879), this court reviewed a contract whereby a railroad, itself under contract to the City of Oskaloosa to construct a track servicing the city, subcontracted with a construction company for construction of a portion of the roadway. When the subcontractor contacted the railroad president to inform him that construction company was financially unable to complete the work, the railroad president promised to pay the amounts expended to complete the subcontract. Upon suit to enforce this promise, however, we held the agreement to be without consideration and stated:

> That a promise to do what a person is bound to do by law is not a good consideration for another undertaking, and that a person is not bound to fulfill his promise to pay another for doing what he is bound by law to do, is well settled.

*Id.* at 488. *See Runkle & Fouse v. Kettering,* 127 Iowa 6, 8, 102 N.W. 142 (1905).

The principle of modification must be distinguished from the situation in which a contract is rescinded and a new contract entered into by the parties. "We have long recognized that parties to a valid contract may rescind or abandon it, or substitute another in its place, or by conduct inconsistent with the continued existence of the original contract estop themselves from asserting any right thereunder." *Severson,* 250 N.W.2d at 421; *Morse v. Slocum,* 192 Iowa 1080, 1094, 186 N.W. 22, 28 (1922). *See Holi-Rest, Inc. v. Treloar,* 217 N.W.2d 517, 524 (Iowa 1974).

■ Where a contract is rescinded the contractual obligations of the parties are discharged, although the parties may enter into a new contract. Rescission and entry into a new contract, in contrast to modification, does not require new consideration. In 1A *Corbin on Contracts* § 186, at 159 (1963) we find the following:

It is quite true that the mutual rights and duties existing under a bilateral contract can be discharged by a mutual agreement of rescission. When such a rescission has taken place, neither party has any further right or duty under the rescinded contract. If that contract was a contract of employment, the servant is out of a job and free to take a different one, and the master is out of a servant and free to hire a new one in his place. In such a case as this, the two parties have exactly the same power to make a new contract as they would have had if there had been no previous transaction between them. A new agreement for exactly the same service at either a greater or a less compensation will not be invalidated by the fact that the servant was previously bound to render such service. The rescission terminated that previous duty; so that at the time the new agreement is made there is no already existing duty to affect its validity. This is true whether the new agreement is unilateral or bilateral in form—whether the master's promise of compensation at the altered rate is given in exchange for the servant's new promise of the identical service or for his actual rendition of that service.

*See* 17 Am.Jur.2d *Contracts* § 463 at 932. *See also Evans v. McKanna,* 89 Iowa 362, 56 N.W. 527 (1893); *Strahn v. Johnson,* 197 Iowa 1324, 196 N.W. 731 (1924).

The distinction between modifying a contract and rescinding the original and entering into a new contract was aptly discussed in *Awe v. Gadd,* 179 Iowa 520, 161 N.W. 671 (1917). In *Awe* the parties entered into a written contract for sale of a farm with stated consideration to be assumption by the buyer of all record encumbrances. Seller, however, alleged buyers subsequently entered into an oral agreement whereby buyers agreed to pay sellers all surplus realized by sale of the farm or the reasonable value above encumbrance if no sale were made. In ruling on the sellers' contention, this court said:

> It is undoubtedly true that the parties may by oral agreement set aside a previ-

ous written contract and substitute a new oral agreement in lieu thereof. In such case the old agreement would be the consideration for the new . . .

It is doubtless competent, also, for parties to agree upon a modification of a previous written contract as distinguished from a complete setting aside thereof or a complete substitution therefor. . . . It was incumbent upon the plaintiff to show a consideration for such undertaking. . . . It will not avail him as a consideration to say now as a witness that he would not have performed the written contract without the additional promise.

*Id.* at 523–24, 161 N.W. at 673.

The clarity with which these principles were distinguished in *Awe,* however, has not been constant in our case law. In the earlier case of *Jones v. Haines,* 117 Iowa 80, 90 N.W. 518 (1902), an attorney entered into an agreement to represent a client in litigation involving the right to redemption of property from a sheriff's sale with compensation contingent upon a favorable judgment. Both parties admitted the existence of the original employment contract; however, the attorney alleged his client subsequently changed her mind regarding redemption of the property and agreed to pay him the reasonable value of his services. We held:

It was, we think, competent for the parties to change the basis and terms of their agreement. According to plaintiff's contention, the first agreement did not contemplate a redemption by the defendant. If so, and at a later date this plan was abandoned, and defendant desired to exercise that right, such change in the plan of action would afford sufficient consideration to support the new agreement.

*Id.* at 82, 90 N.W. at 519.

Although *Jones* is consistent with the principle that terms of a rescinded contract do not affect the sufficiency of consideration for promises in a new contract, the case was subsequently, and confusingly, cited in support of a contrary principle. In *Lamb's*

*Estate v. Morrow,* 140 Iowa 89, 117 N.W. 1118 (1908), the *Jones* decision, alone, was cited in support of the principle that "the cancellation *or modification* of the terms and obligations of a written contract, while remaining executory, is sufficient consideration for a subsequent oral one." *Id.* at 97, 117 N.W. at 1122. (Emphasis added.)

The confusion generated by the conflict of the statement in *Lamb's Estate* with both previous and subsequent case law holding modification of a contract requires additional consideration was heightened by a trilogy of cases decided between 1946 and 1955. In *Williams v. Cassidy,* 237 Iowa 1042, 23 N.W.2d 423 (1946), *O'Dell v. O'Dell,* 238 Iowa 434, 26 N.W.2d 401 (1947), and *Siebring Manufacturing Co. v. Carlson Hybrid Corn Co.,* 246 Iowa 923, 70 N.W.2d 149 (1955), the principles distinguishing modification of a contract and rescission of a contract followed by entry into a new contract became blurred. *See* Note, 44 Iowa L.Rev. 693, 698, 701–03 (1959); Hudson, *Doctrine of Consideration in Iowa Revisited—Discharge or Modification of Duties,* 5 Drake L.Rev. 3, 6–8 (1955).

In *Williams v. Cassidy,* this court was faced with a 1928 contract for sale of land which, due to the effect of the depression on land values, was renegotiated in 1933. A lesser purchase price was agreed upon in renegotiation and, ultimately, paid in full. Sellers, however, subsequently served notice of forfeiture pursuant to the 1928 contract and asserted lack of consideration invalidated the 1933 renegotiation. This court declined to accept the sellers' reasoning and, instead, determined the 1933 renegotiation to have constituted a rescission of the 1928 contract and establishment of a new contract. 237 Iowa at 1050–51, 23 N.W.2d at 428.

The *Williams* decision has been criticized as an attempt to avoid the rule that modification of a contract requires consideration. In Note, 44 Iowa L.Rev. 693, 698 (1959), we find the following discussion:

The recent case of *Williams v. Cassidy* is an example of the court's concluding in effect that there had been a rescission at

law. It appears from the report that there was no moment in time between the making of the original contract and the modification when the parties were actually not bound. The court was unable to find consideration for the new agreement to accept less money on a real estate installment contract. Yet, finding the agreement fair under the circumstances (there being a depression at the time), the court ruled there was a rescission and a new contract. Therefore, new consideration was unnecessary to support the promise to accept less money. A more realistic basis for the decision, however, would have been the equities involved.

A similar result was obtained in *O'Dell v. O'Dell* where an antenuptial contract provided that, upon the death of one party, the survivor was not to receive any of the deceased's property. The husband, thereafter, became seriously ill and the wife cared for both him and the household over a thirteen year period. Apparently in light of his wife's devotion, the husband allegedly executed another document providing his wife receive her statutory share in his estate. In determining the validity of the latter agreement the court, generally, stated that:

> Any executory contract, when the rights of others are not involved, may be rescinded altogether *or modified,* by the mutual consent of the parties . . .
> Those who are qualified to make an antenuptial or other contract are likewise qualified, by mutual consent to eliminate *or modify* any part thereof, or to unmake the contract altogether, or to substitute a new contract.

238 Iowa at 455, 26 N.W.2d at 412. (Emphasis added.)

In the above quotation, as well as elsewhere in the opinion, the rights of rescission and modification are spoken of jointly without accompanying clarification that modification requires additional consideration. In any event, it is concluded that no additional consideration need be found to support the latter agreement. Apparently, but not clearly, the decision is based on a theory of

rescission, 238 Iowa at 462–63, 26 N.W.2d at 415–16. *But see* 238 Iowa at 473, 26 N.W.2d at 421 (Smith, J., dissenting) ("If by the post-nuptial contract alleged here there was some reciprocal contingent provision in decedent's favor, that would probably be sufficient consideration.")

The confusion spawned by the *O'Dell* undifferentiated treatment of modification and rescission was followed by *Siebring Manufacturing Co. v. Carlson Hybrid Corn Co.* In *Siebring* the buyer entered into a contract for the purchase of corn crib roofs. A subsequent steel strike, however, caused the cost of steel to raise. The parties, thereafter, agreed to perform the contract under an increased purchase price. In response to the assertion that the subsequent modification was unenforceable because not supported by a new consideration, this court concluded none was required and said:

> There is no necessity for a new consideration where a former contract has been modified. This is our holding in *O'Dell v. O'Dell,* 238 Iowa 434, 460, 26 N.W.2d 401, 414: "Any dissolution * * * of any other executory contract may be effected by the mutual consent or agreement of the parties to do so. Lawful cause is not necessary. No new consideration is needed. The mutual release from the old contract is adequate consideration * * ."
>
> And in *Lamb's Estate v. Morrow,* 140 Iowa 89, 97, 117 N.W. 1118, 1122, 18 L.R. A.,N.S., 226, we commented on the matter of consideration in a modified contract as follows: " * * * And as a general rule, the cancellation or modification of the terms and obligations of a written contract, while remaining executory, is sufficient consideration for a subsequent oral one. This is fundamental doctrine. See Page on Contracts, sections 318, 608, 1348, 1339, 1344; *Jones v. Haines,* 117 Iowa 80, 90 N.W. 518. * * ."

246 Iowa at 928, 70 N.W.2d at 152. (Citations omitted.) In unfortunately relying on *O'Dell* and *Lamb's Estate* for the proposition that contract modification requires no

new consideration, *Siebring* failed to explain, or, in fact, give citation to a long line of authority to the contrary.

*Siebring* has been characterized as a rescission case. *See* Note, 44 Iowa L.Rev. 693, 701–02 (1959); Hudson, *Doctrine of Consideration in Iowa Revisited—Discharge or Modification of Duties,* 5 Drake L.Rev. 3, 6–8 (1955). Indeed, the opinion cites authority for and states the principle that rescission and entry into a new contract does not require new consideration. In resolution of the issue, however, the court repeatedly refers to the "modification" of the contract, as evidenced by the following:

> There appears to be ample evidence that the defendant by its conduct indicated a willingness to accept the provisions of the *modified* contract as long as it wanted delivery of the crib roofs. It had received up to November 7, 1949, 988 of the 14 foot 8 inch crib roofs and 697, 18 foot 8 inch roofs. It had received invoices showing charges for the roofs at the *modified* price and had remitted to the plaintiff to apply on the account a total of $82,500. The defendant on November 7, 1949 wrote a letter to the plaintiff stating it was thereafter not recognizing any other price except as originally agreed upon. This letter in itself indicates the defendant had previously considered the contract *modified* and then sought to fall back on the original agreement.

246 Iowa at 931, 70 N.W.2d at 153. (Emphasis added.) The blurring of modification and rescission doctrines had become so complete by *Siebring* that the court, comfortably, concluded no new consideration was necessary to support either modification or rescission. It is not surprising that, some twelve years later, this court was moved to comment that "there is some degree of confusion as to the necessity of consideration to support a modification." *Davenport Osteopathic Hospital Association,* 261 Iowa at 254, 154 N.W.2d at 157.

The *Siebring* decision is criticized in 1A *Corbin on Contracts* § 186, at 159–60 n. 72, 159–64. *Corbin* notes courts frequently,

and erroneously, find a simultaneous rescission and new agreement where contract compensation has been modified. This reasoning, although circular, results in affirmance of the "modified" contract without nullification of the supposed rule that performance of a pre-existing duty is not sufficient consideration for a promise of additional compensation.

Compare *Corbin* with Restatement (Second) of the Law of Contracts § 89D, *Comment b, Illustration 4* (1973). Section 89D provides:

> A promise modifying a duty under a contract not fully performed on either side is binding
>
> (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made . . . . .

The Restatement similarly rejects use of a fictitious rescission, utilized in *Williams, O'Dell* and *Siebring* and criticized by *Corbin,* but advocates upholding modification, despite absence of consideration, where there is an "objectively demonstrable reason for seeking a modification." The Restatement further comments that:

> [t]he reason modification must rest in circumstances not "anticipated" as part of the context in which the contract was made, but a frustrating event may be unanticipated for this purpose if it was not adequately covered, even though it was foreseen as a remote possibility. When such a reason is present, the relative financial strength of the parties, the formality with which the modification is made, the extent to which it is performed or relied on and other circumstances may be relevant to show or negate imposition or unfair surprise.

While the Restatement position is interesting, it is inapplicable to the present case. There were no unanticipated circumstances which prompted Gustafsons to demand a $10,000 increase in the purchase price. The price hike, apparently, was motivated by a desire for more money. *But cf. Siebring,* 246 Iowa at 926, 70 N.W.2d at 151 (cost of steel inflated by steel strike). Under our

present facts, therefore, we decline to apply the Restatement provision for affirmance of a contract modification in absence of consideration. We, however, do not discount application of the Restatement principle under future, appropriate circumstances.

Because we believe *Lamb's Estate, O'Dell* and *Siebring* to have digressed from our previous case law on the necessity of consideration to support a contract modification without either sound reasoning or reconciliation of previous authority, we reaffirm our prior holdings that new consideration is necessary to support a contract modification. Language to the contrary appearing in cases including *Lamb's Estate, O'Dell* and *Siebring* is no longer controlling.

The case law confusion on the distinction between modification and rescission followed by entry into a new contract is reflected in these proceedings. The parties do not address whether the September 20 agreement constituted a modification or a new contract.

Because we believe the facts show no rescission of the August 30 contract but, instead, a modification of its terms, we find new consideration was necessary to support the September 20 agreement. Since consideration is neither shown nor claimed, the September 20 agreement to raise the purchase price on the 155 acres by $10,000 is not binding.

VI. *Appropriateness of specific performance.* Reckers seek specific performance of the contract for purchase of Gustafsons' land.

"[S]pecific performance is available when the contract involves property which is unique or possesses special value. Real estate is assumed to possess this necessary quality." *Moser v. Thorp Sales Corp.,* 256 N.W.2d 900, 907 (Iowa 1977) (Citation omitted.); *Severson,* 250 N.W.2d at 423.

We find Reckers are entitled to specific performance of the portion of the August 30 oral contract relating to sale of the 155 acre tract.

The description of the 155 acre tract can be determined through deduction of the five acre tract, as described in the diagram, Exhibit E, and the record in this case, from the 160 acres.

VII. *Disposition.* Reckers are entitled to a decree of specific performance based on the August 30, 1976 oral contract, with practical equitable modifications dictated by the passage of time since the contract was formed, substantially as follows.

Plaintiffs, Loran Recker and Mary Recker, are entitled to specific performance of their contract for the purchase of the Northwest Quarter of section 16, Township 91, North, Range 8, West of the Fifth P.M., Fayette County, Iowa (except for the five acres which is the defendants' homestead building site described in Exhibit E in the trial court record) at a total price of $290,-000. Down payment is $40,000, of which $5,000 has already been paid by plaintiffs to defendants, and the remaining $35,000 shall be paid by plaintiffs on date of possession which shall be sixty days after issuance of procedendo herein. Equal yearly payments of $28,000 were due under the contract on March 1, 1978 and March 1, 1979 but shall not now be payable by plaintiffs to defendants until date of possession. Additional annual payments of $28,000, including principal and interest, shall be paid by plaintiffs to defendants each year commencing with March 1, 1980 and on March 1 of each year thereafter. However, any remaining principal balance, after all annual payments, shall be paid March 1, 1987. Interest on the unpaid principal balance, at the agreed rate of 7½% per annum, shall commence on the date possession is given by defendants to plaintiffs.

Defendants shall account to and pay plaintiffs for rentals for the land for the period from March 1, 1977 until date possession is given. Defendants shall pay the general real estate taxes due and payable in 1977 and plaintiffs shall pay or account to defendants for the real estate taxes thereafter. Any sums found due by either party to the other in any accounting shall bear interest at the legal rate only from date possession is given.

Defendants shall furnish plaintiffs an abstract of title showing merchantable title in and to the above described real estate in defendants. The real estate is purchased by plaintiffs as tenants in common. Defendants shall execute a warranty deed in favor of plaintiffs for the 155 acre premises upon completion of all payments on the sale contract.

The sale includes only 155 acres and not the five acre homestead site of defendants. There shall be no deficiency judgment in the event of forfeiture of the contract.

As to Gustafsons' appeal, the court's decree is modified in the respects above stated and, as modified, is affirmed. The case also is modified and affirmed as to Reckers' cross-appeal. We return the case to district court for entry of decree and further proceedings consistent with this opinion.

In reaching our disposition in this vigorously contested case, we have considered the many contentions made by the parties, whether specifically discussed or not.

Costs in this court are taxed to defendants.

AFFIRMED AS MODIFIED ON APPEAL AND CROSS–APPEAL.