**CONTEMPO DESIGN, INCORPORATED, Plaintiff–Appellee,**

v.

**CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS, Defendant–Appellant.**

No. 98–3206

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1999

Reargued En Banc Dec. 14, 1999

Decided Aug. 15, 2000

---

Karl W. Grabemann, Ogletree, Deakins, Murphy, Smith & Polk, Peter A. Steinmeyer (argued), Epstein, Becker & Green, Chicago, IL, for Plaintiff-Appellee.

Travis J. Ketterman (argued), Whitfield & Gregoria, Chicago, IL, for Defendant-Appellant.

Before FLAUM, Chief Judge, and POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, EVANS and WILLIAMS, Circuit Judges.

RIPPLE, Circuit Judge.

Contempo Design, Inc. ("Contempo") filed an action under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, against the Chicago and Northeast Illinois District Council of Carpenters ("the Union") for striking in violation of their collective bargaining agreement. The Union, believing it was not bound by the collective bargaining agreement, had instituted a strike against Contempo to force it to agree to a new collective bargaining agreement. Contempo acquiesced due to its own economic situation.

The district court granted partial summary judgment to Contempo. It first held that the Union was bound to the original collective bargaining agreement and then concluded that the Union had breached that collective bargaining agreement by violating its no-strike provision. The remaining issues proceeded to trial before the court. After the trial, the district court awarded Contempo damages for (1) Contempo's "catch-up" costs and (2) the difference in costs to Contempo between the original collective bargaining agreement and the second collective bargaining agreement. The Union appeals both the grant of summary judgment and the award of damages. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

Contempo is in the business of constructing, storing, setting up, and taking down exhibits and displays at conventions and trade shows and therefore employs carpenters who are represented by the Union. However, the Union does not bargain with Contempo to reach a collective bargaining agreement. Instead, the Union bargains with the Woodworkers Association of Chicago, Inc. ("the Woodworkers Association"), a multiemployer bargaining unit, to form a collective bargaining agreement. Although Contempo is not a member of the Woodworkers Association, the collective bargaining agreement between the Union and the Woodworkers Association ("the WAC CBA") provides the basis for Contempo's own agreement with the Union. Specifically, Contempo agreed to adopt and be bound by the WAC CBA and by any successive agreements between the Woodworkers Association and the Union by what is known as a "hard card agreement."

Contempo's agreement with the Union provides as follows:

The EMPLOYER and the UNION do hereby agree as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER within the territorial and occupational jurisdiction of the UNION.

2. The parties adopt, and the EMPLOYER agrees to be bound by the terms and conditions of a Collective Bargaining Agreement dated June 1, 1979, between the UNION and Woodworkers Association of Chicago Inc. as bargaining agent for their members . . . .

. . . . .

4. This agreement, and the agreement adopted by reference as aforesaid, shall be in effect as of June 1, 1979, and remain in effect to and including the expiration date of the agreement adopted by reference. This agreement shall continue in effect from year to year thereafter and the parties specifically adopt any agreement entered into between the UNION and Woodworkers Association of Chicago Inc., bargaining agent for their members, subsequent to the expiration date of the agreement adopted by reference as aforesaid, unless notice of termination or amendment is given in the manner provided herein.

5. Either party desiring to amend or terminate this agreement must notify the other with an acknowledgment in writing, at least three calendar months prior to the expiration of the then agreement adopted by reference.

R.1–1, Ex.A at 1.

Contempo entered into this hard card agreement with the Union in 1980. The parties continued to be bound by successive WAC CBAs through the automatic renewal provision of the hard card agreement. In 1993, the Woodworkers Association and the Union entered into a CBA to be effective through May 31, 1995, ("the 1993 WAC CBA"). Pursuant to Contempo's hard card agreement, Contempo and the Union automatically adopted and became bound by this 1993 WAC CBA.

On February 27, 1995, the attorney for the Woodworkers Association, Karl W. Grabemann, sent a letter to the Union, which stated that the employer-members of the Woodworkers Association desired to terminate their respective agreements with the Union. In a subsequent letter, Grabemann informed the Union that the employer-members of the Woodworkers Association had extricated themselves from their multiemployer bargaining unit in order to bargain on an individual basis with the Union. Contempo was not a member of the Woodworkers Association, nor was it listed on either letter as a participating employer.

Despite the intentions manifested in the above correspondence, the Union and the Woodworkers Association reached an agreement for a successor to the 1993 WAC CBA. This successor agreement, the 1995 WAC CBA, became effective June 1, 1995, and was to remain in effect until May 31, 2000.

From 1980, when Contempo entered into its hard card agreement with the Union, until June 1, 1995, Contempo and the Union never engaged in any collective bargaining negotiations. Also, the Union never requested or required Contempo to bargain with the Union, nor did Contempo request that the Union bargain with Contempo. The Union admits that it did not provide written notice to Contempo of a desire to amend or terminate their hard card agreement at least three months prior to the May 31, 1995, expiration date of the 1993 WAC CBA. Usually, after the Union and the Woodworkers Association entered into a new collective bargaining agreement, the Union mailed a copy to Contempo; after the 1995 negotiations, however, the Union did not provide Contempo with a copy of the new agreement.

On June 1 or 2, 1995, the Union's business agent visited Contempo and gave Contempo's president, Robert Shaw, a copy of a written proposal for a new CBA between Contempo and the Union. The agent informed Shaw that he wanted the contract signed by June 9 and that, if Shaw did not sign by that date, a "work action" might be called.

In a letter dated June 14, Grabemann, now also representing the hard card agreement employers, including Contempo, initiated collective bargaining negotiations with the Union.[1] Grabemann negoti-

---

1. The present lawsuit originally was filed by

Contempo, Design Agency, Inc., Howard Dis-

ated with the Union on July 12, July 14, and July 17. Following the negotiations on July 17, Contempo claims that Grabemann first discovered that Contempo, as well as the other employers, had entered into hard card agreements with the Union and that these agreements never had been terminated. In a letter dated July 18, Grabemann ended the negotiations with the Union. In his letter, he stated, in pertinent part, as follows:

> The employers that I represent have determined that they are contractually and lawfully entitled to adopt by reference the new or successor Collective Bargaining Agreement between your Union and Woodworkers Association of Chicago, the term of which is from June 1, 1995 to May 31, 2000. Of course, these employers need not elect to be so bound—they *are* so bound contractually and by operation of law.
>
> Each of the employers that I represent are party to a so-called "hard card" Agreement with your Union, copies of which are in your files. Inasmuch as your Union has failed to provide proper and timely notice of the termination of this Agreement, the parties to it are and remain bound to the Agreement and, as a consequence, the employers that I represent are contractually bound by reference to the new or successor Collective Bargaining Agreement between your Union and Woodworkers Association of Chicago.

R.10, Ex.1 at 1. No additional bargaining occurred after July 17.

The 1995 WAC CBA contains the following "no–strike" provision:

plays, Inc., M.G. Design Associates Corp., Osgood Displays, Inc., and Stevens Exhibits & Displays, Inc. After the district court granted summary judgment, all employers except Contempo settled with the Union, and, thus, those employers are not parties to this appeal. In this opinion, therefore, we make reference only to Contempo.

**2.** The settlement is set forth in a letter from Contempo to the Union and is dated March 5,

> 5.5 There shall be no strikes, lockouts or stoppage [sic] of work for any causes not covered by this Agreement. The parties will, by lawful means, compel their members to comply with this Agreement.

R.1–1, Ex.G at 4. Nevertheless, on March 4, 1996, the Union engaged in a strike of Contempo, of which Contempo did not have advance notice. At this time, Contempo was pursuing a multimillion dollar contract with Bank of America to construct minibanks in shopping malls. It already had expended significant amounts of time and money to help it secure the contract. According to Contempo, it feared that, in its time-sensitive industry, the strike would cause it to lose Bank of America as a potential client. At the same time, Contempo also had other pressing financial obligations, including a significant bank loan from the purchase of the company several years earlier. This loan had been restructured several times, and, for the year preceding the strike, Contempo had been able to make only interest, and not principal, payments.

Due to its financial situation, the same day the strike began, Contempo entered into negotiations with the Union to settle it. As part of that process, Contempo agreed to a new CBA ("the Contempo CBA"). Pursuant to the settlement between Contempo and the Union, Contempo was required to pay the striking employees' wages for the two days of the strike.[2]

The 1995 WAC CBA and the Contempo CBA differ in the wage rates and in the cost of fringe benefits that Contempo pays

1996—the day the parties completed their negotiations. The letter states that, per the negotiations, (1) Contempo will pay two-days wages to all carpenters that reported to work on March 4, 1996, (2) Contempo will not take disciplinary action against any of its employees as a result of the strike, and (3) Contempo is in agreement with the industry contract upon review and signing. *See* R.40, Jt. Ex.13.

its employees.[3] Also, Contempo must pay a greater rate of contribution to the Chicago District Council of Carpenters Welfare Fund under the Contempo CBA.[4] Finally, the agreements differ in their duration: The 1995 WAC CBA covers June 1, 1995, to May 31, 2000, and the Contempo CBA covers June 1, 1995, to May 31, 1998.

During the negotiations with the Union, Contempo reserved its right to sue. Later, on July 23, 1996, it filed this action against the Union.

## B. Proceedings in the District Court

The district court granted partial summary judgment to Contempo because it held that the parties were bound by the 1995 WAC CBA at the time of the Union's strike. First, it determined that neither party had terminated the hard card agreement according to the agreement's terms. Next, it held that Contempo had not waived timely notification of the Union's intent to terminate the agreement. Finally, the court stated that the Union had not shown that it relied to its detriment on the termination of the hard card agreement in its negotiations with the Woodworkers Association or in its negotiations with Contempo. Thus, the court concluded that the Union and Contempo were bound by their hard card agreement and by the 1995 WAC CBA at the time of the Union's strike. Therefore, the court held that the Union's strike was in violation of the no-strike provision of the 1995 WAC CBA.

Two issues then proceeded to trial before the court. First, the court asked whether the Contempo CBA had been signed under economic duress. The court stated that, when entering into the Contempo CBA to end the strike, Contempo was not bereft of the quality of mind necessary to make a contract. Thus, the court held that the Contempo CBA was not entered into under economic duress.

Second, the court calculated the amount of damages owed to Contempo as a result of the Union's breach of the no-strike provision in the 1995 WAC CBA. The court sought to make Contempo whole and, thus, focused upon what the situation would have been if the strike had not occurred. The court first determined that Contempo was entitled to the costs necessary to catch up on work missed due to the two days of the strike. The cost of catching up, as stipulated by the parties, was $11,574.48. The court therefore awarded Contempo $11,574.48 in damages.

The court next determined that Contempo had assumed costs under the Contempo CBA which it would not have incurred but for the Union's illegal strike. According to the court, at the time of the strike, Contempo was perched to obtain a multiyear, multimillion dollar contract with Bank of America to construct minibanks in shopping malls, but the strike placed this opportunity in jeopardy. As the court discussed, Contempo decided to sign the Contempo CBA to end the strike rather than hold out and possibly lose the Bank of America contract. Contempo reasonably had to minimize the damages from the Union's breach of the 1995 WAC CBA and to achieve that goal, the court explained, Contempo agreed to sign the Contempo CBA. But for the illegal strike, the court concluded, Contempo would not have entered into the Contempo CBA and, therefore, would not have incurred additional expenses over the costs in the 1995 WAC CBA. Thus, the court determined, Contempo's compensatory damages included the difference in costs between the

3. The annual wage increase for carpenter-employees under the 1995 WAC CBA was $.40 the first year, $.40 the second year, $.45 the third year, $.50 the fourth year, and $.50 the fifth year. Under the Contempo CBA, the wage increase is $.70 the first year, $.75 the second year, and $.80 the third year.

4. Under the 1995 WAC CBA, Contempo was to pay $3.60 per hour effective June 1, 1996; however, under the Contempo CBA, Contempo is to pay $3.98 per hour.

1995 WAC CBA and the Contempo CBA, or $433,139.39.

## II

## DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 377 (7th Cir.2000). The findings of fact made by the district court at the trial are reviewed under the clearly erroneous standard. *See* Fed.R.Civ.P. 52(a); *see also Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir.2000). Questions of law are reviewed de novo. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1015 (7th Cir.2000); *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 744–45 (7th Cir.1998).

### B. Applicable Law

Contempo filed suit under § 301 of the LMRA, which states: "Suits for violation of contracts between an employer and a labor organization representing employees ... may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185. At the time § 301 was enacted, no restrictions existed on unions. The preceding labor statute, the Wagner Act of 1935, had prevented only employers from engaging in unfair labor practices. *See* 1 P. Hardin, *The Developing Labor Law* 957 (3d ed. 1992). In many states, unions could not be sued directly and, thus, there was no remedy against them. *See id.* With the new statute, Congress intended to make collective bargaining agreements enforceable against *both* employers and unions. *See id.* In § 301, Congress sought to add stability to labor relations and to make collective bargaining agreements valid, binding, and enforceable. *See id.* at 959. Doing this, Congress hoped, would allocate responsibility among parties and promote industrial peace. *See id.* The primary goals of the statute were to protect the rights of workers, to promote industrial peace, and to preserve the free flow of commerce. *See Labor Management Relations Act of 1947*, Pub.L. No. 80–101, ch. 120, sec. 101, § 1, 61 Stat. 135, 135–36 (1947).

The Supreme Court's watershed opinion in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), reflected the congressional concern about ensuring industrial peace. It stated that Congress had "indicate[d] a primary concern that unions as well as employees should be bound to collective bargaining contracts" and that "Congress was also interested in promoting collective bargaining that ended with agreements not to strike." *Id.* at 453, 77 S.Ct. 912. Due to its concern for enforcing collective bargaining agreements and promoting industrial peace, the Court held that Congress had expressed "a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations." *Id.* at 455, 77 S.Ct. 912. Thus, the Court concluded, Congress had created substantive law by enacting § 301. *See id.* at 451, 456, 77 S.Ct. 912.

According to the Court, the substantive law of § 301 is federal law, "which the courts must fashion from the policy of our national labor laws." *Id.* at 456, 77 S.Ct. 912. It explained that the Act expressly furnished some substantive law and for those areas in which the statute did not expressly speak, courts should fill the gaps

> by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of the federal law will govern, not state law. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy.

*Id.* at 457, 77 S.Ct. 912 (citations omitted).

The Supreme Court reiterated the importance of the collective bargaining pro-

cess in resolving industrial disputes in the *Steelworkers* trilogy: *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Court continued to stress the significance of the collective bargaining process and the need to enforce the terms of collective bargaining agreements in *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), and *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).[5]

■ When the LMRA does not expressly provide the substantive law to be applied, federal courts have the authority to create a federal common law for the enforcement of collective bargaining agreements. *See Textile Workers*, 353 U.S. at 457, 77 S.Ct. 912; *see also Litton Fin. Printing Div., a Div. of Litton Bus. Sys. v. NLRB*, 501 U.S. 190, 202–03, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 405–06, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981). Therefore, this court has the authority to fashion the appropriate common law in this area of the law. *See United States v. Palumbo Bros.*, 145 F.3d 850, 863–64 (7th Cir.) ("To adjudicate and resolve disputes involving breaches of collective bargaining agreements, § 301 of the LMRA 'authorizes federal courts to fash-

ion a body of federal law' to enforce those agreements." (quoting *Textile Workers*, 353 U.S. at 451, 77 S.Ct. 912)), *cert. denied*, 525 U.S. 949, 119 S.Ct. 375, 142 L.Ed.2d 310 (1998).

## C. Breach of the 1995 WAC CBA

### 1.

■ The parties dispute whether the automatic renewal provision of the hard card agreement bound the parties to the 1995 WAC CBA. We believe that the district court correctly decided this issue.

We cannot accept the Union's submission that the suggested transformation of the Woodworkers Association into single-employer bargaining units made the automatic renewal provision impracticable. According to the Union, the basic assumption of the hard card agreement was that the Woodworkers Association would negotiate *one* agreement between the employer-members of that Association and the Union; however, the splintering of the Woodworkers Association would create the possibility of multiple, conflicting agreements. As the district court noted, the Woodworkers Association and the Union, despite preliminary overtures to the contrary, did agree to the 1995 WAC CBA. There was, therefore, simply an insufficient basis to justify finding that the automatic renewal provision was impracticable.

The Restatement (Second) of Contracts explains the test for impracticability of a contract as follows:

5. In *Charles Dowd Box Co.*, the Court held that federal court jurisdiction under the LMRA did not divest state courts of jurisdiction because Congress had intended, by § 301, to expand and not limit the availability of forums for the enforcement of collective bargaining agreements. *See* 368 U.S. at 508, 82 S.Ct. 519. Then, in *Lucas Flour*, the Court clarified that, although state courts had jurisdiction to hear § 301 claims, the law to be applied was federal law. *See* 369 U.S. at 102–03, 82 S.Ct. 571. As the Court stated,

the subject matter of § 301(a) "is peculiarly one that calls for uniform law." The possibility that individual contract terms might

have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.

*Id.* at 103, 82 S.Ct. 571 (citations omitted); *see also International Union, United Auto., Aerospace & Agric. Implement Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 701, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir.1997). ("The substantive law in a section 301 suit for breach of the collective bargaining agreement is federal common law rather than state law.").

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981). Here, the record discloses nothing more than an initial possibility that a basic assumption underlying the hard card agreement—the existence of a single agreement between the Union and the Woodworkers Association—might change. This mere possibility did not entitle the Union to proceed as if the hard card agreement had been invalidated. Moreover, a letter from the Woodworkers Association to the Union, correspondence to which Contempo was not a party, could not operate to alter unilaterally the contractual obligation between Contempo and the Union when the potential source of confusion—multiple CBAs between the Woodworkers Association and the Union—never came to be.

█ As the district court explained, the hard card agreement detailed explicitly the procedure a party must follow to provide notice of termination of the agreement. The Union admits that it did not follow such procedure. The terms of a collective bargaining agreement are to be enforced strictly when the terms are unambiguous. *See Young v. North Drury Lane Prods.*, 80 F.3d 203, 205 (7th Cir.1996) ("We must enforce the terms of a collective bargaining agreement when those terms are unambiguous."); *Central States, Southeast & Southwest Areas Pension Fund v. Hartlage Truck Serv., Inc.*, 991 F.2d 1357, 1361 (7th Cir.1993) ("We must enforce the terms of the CBAs when those terms are unambiguous."); *accord Irwin v. Carpenters Health & Welfare Trust Fund*, 745 F.2d 553, 556 (9th Cir.1984). The district court therefore correctly concluded that, because neither the Union nor Contempo

provided written notice to the other party at least three months prior to the expiration of the 1993 WAC CBA, the automatic renewal provision went into effect, and the parties became bound to the 1995 WAC CBA. It is undisputed that neither party provided timely notice of a desire to amend or terminate the hard card agreement. Therefore, by its strict terms, the hard card agreement remained in effect and operated automatically to bind the parties to the 1995 WAC CBA.

### 2.

In a closely related argument, the Union argues that the conduct of the parties manifested an intent to waive the lack of timely notice of termination of the master agreement. According to the Union, such a waiver occurred through one of two sequences of events: (1) the letters from the Woodworkers Association to the Union stating that the employer-members wished to bargain individually, and/or (2) the conduct of Contempo and the other hard card agreement employers subsequent to the automatic renewal of the hard card agreement. ·

█ With respect to the alleged waiver by the Woodworkers Association, we agree with the district court that the letter from Attorney Grabemann to the Union, in which the employer–members of the Woodworkers Association indicated that they would no longer be parties to a multiemployer bargaining unit, did not act as a waiver from Contempo. As the district court pointed out, Contempo was not a member of the Woodworkers Association and was not listed in the letter. Thus, the Woodworkers Association could not waive timely notice for Contempo.

█ The Union argues also that Contempo waived the Union's untimely notification of termination by negotiating with the Union soon after the 1995 WAC CBA

went into effect.[6] The district court noted that, in the cases relied upon by the Union, the parties waived the untimely notification of termination *prior* to the automatic renewal of the successor agreement. By contrast, the district court explained, the conduct that allegedly gave rise to a waiver here occurred *after* the automatic adoption of the 1995 WAC CBA. Therefore, the district court concluded that Contempo did not waive the Union's untimely notification of termination.

■ We believe that the district court correctly analyzed the Union's waiver claim. None of the actions that the Union relies upon as evidence of waiver took place before the 1995 WAC CBA was signed. Indeed, the record establishes that neither the Union nor Contempo ever attempted to terminate the ongoing contractual relationship before the effective date of the new master CBA, June 1, 1995. Therefore, at the time the events relied upon by the Union took place, both parties already were bound by the new agreement. This situation is indeed very different from the one found in the cases relied upon by the Union to establish waiver. In those. cases, one party had attempted to terminate an agreement and the other party waived noncompliance with the termination requirements necessary to prevent the new agreement from taking effect.[7] Conduct occurring *after* the new agreement has taken effect cannot "waive" a timely notice provision because, even in the absence of that conduct, the other party could not have done anything differently to prevent the agreement from taking effect; the agreement was already in force.

**3.**

The Union next submits that it had relied to its detriment on the termination of Contempo's hard card agreement when it negotiated the 1995 WAC CBA with the Woodworkers Association and when it negotiated the Contempo CBA with Contempo. Because Grabemann demanded to bargain on behalf of several hard card agreement employers, the Union claims that it detrimentally abandoned its individual negotiations with other hard card agreement employers. The district court explained that the Union did not provide any authority to support its argument, but that Contempo had posited two possible sources of law for the Union's argument:

6. The Union relies upon (1) two letters from Grabemann to the Union attempting to initiate negotiations and (2) the three unsuccessful negotiation sessions between the Union and the hard card agreement employers.

7. In *Allied Industrial Workers, Local Union No. 770 v. Hutco Equipment Co.*, 285 N.L.R.B. 651, 1987 WL 89875 (N.L.R.B.1987), the NLRB found that a union had waived any objection to an employer's untimely notice. The employer notified the union that it was opting out of the collective bargaining agreement's automatic renewal after the notification date. The union agreed to negotiate a new agreement and actually began negotiations. Only after the negotiations soured did the union raise its timeliness objection in an attempt to bind the employer to the automatic renewal provision in the previous agreement. In that case, the employer's notice, as well as the negotiations, occurred prior to the automatic adoption of the successor agreement. Similarly, in *Hassett Maintenance Corp. v. Service Employees International Union*, 260

N.L.R.B. 1211, 1982 WL 24320 (N.L.R.B. 1982), the untimely notice was served before the automatic renewal of the original collective bargaining agreement, and the NLRB held that both parties acted as though the notice was effective and the contract had not been renewed. *See id.* at 1211 n. 3.

The remaining two cases cited by the Union pertain to the requirements necessary for an employer's timely notice to withdraw from a multi-employer bargaining unit. An employer is entitled to withdraw from the bargaining unit for any reason prior to the date set for renegotiation of the existing contract or prior to the date on which negotiations actually commence. *See NLRB v. Hayden Elec., Inc.*, 693 F.2d 1358, 1363 (11th Cir.1982); *NLRB v. Callier*, 630 F.2d 595, 598 (8th Cir.1980). The union, however, may impliedly consent to or acquiesce in the employer's untimely notice of withdrawal by negotiating with the employer on an individual basis. *See Hayden Elec.*, 693 F.2d at 1365; *Callier*, 630 F.2d at 598–99.

estoppel and unilateral mistake. On appeal, the Union argues both theories. We shall examine each.

To find estoppel, one party must have made a misleading representation on which the other party reasonably relied to its detriment. Here, as the district court stated, the Union has not alleged that Contempo made any misleading representations or that the Union reasonably relied on any such misrepresentations. Therefore, the Union could not make out a claim for estoppel.

In a variation on this same theme, the Union also submits that it made a unilateral mistake that ought to excuse it from its obligations to Contempo under the 1995 WAC CBA. According to the Restatement (Second) of Contracts § 153, a contract is voidable due to the mistake of one party when the mistake is about a basic assumption on which the party made the contract. Additionally, the mistake must have a material effect on the agreed exchange of performances, and the mistaken party must not bear the risk of mistake. *See id.* Finally, the court must determine that (1) to enforce the contract would be unconscionable, or (2) the other party has reason to know of the mistake or his fault caused the mistake. *See id.*

We agree with the district court that the Union has not shown that enforcement of the 1995 WAC CBA would be unconscionable. Nor has the Union shown that the Woodworkers Association or Contempo caused the mistake. The Union relies on the affidavit of the Union's business representative and chief negotiator, T. Richard Day, to show that it was mistaken about the hard card agreement employers being bound to the 1995 WAC CBA. In his affidavit, Day states that the Union's negotiations were based on the premise that the ultimate agreement would be binding only on the members of the Woodworkers Association and not on the hard card agreement employers. He claims that, had the mistake not been made, the Union would

have fought for better terms in the 1995 WAC CBA. First, he points out that the economic items in the 1995 WAC CBA would have been different: The Union would have increased its demands for higher wages, benefits, and holidays. Also, he asserts, the Union would have asked for stricter guidelines for work performed outside the shop. Moreover, he claims, the Union would not have agreed to the creation of a committee of Union and Woodworkers Association representatives designed to protect health and welfare costs and benefits. Although some of these items may have changed, the Union has not demonstrated that the difference was so drastic as to be unconscionable. Also, the Union has not shown that the Woodworkers Association or Contempo were at fault for the Union's mistaken belief. Although the Woodworkers Association initially proposed to disband and bargain on an individual basis, it nevertheless ultimately decided to bargain for the new CBA on behalf of all its members. More importantly, Contempo had no role in the Woodworkers Association's decision, and, thus, Contempo clearly was not at fault for the Union's mistaken belief.

4.

As discussed above, the hard card agreement, which automatically bound the Union and Contempo to the 1995 WAC CBA, was enforceable between those two parties. Thus, both the Union and Contempo were bound by the terms of the 1995 WAC CBA. As we have noted previously, the 1995 WAC CBA contained the following no-strike provision:

> 5.5 There shall be no strikes, lockouts or stoppage [sic] of work for any causes not covered by this Agreement. The parties will, by lawful means, compel their members to comply with this Agreement.

R.1–1, Ex.G at 4. The Union's strike of Contempo clearly violated the terms of this provision. Thus, the Union is liable to

Contempo for any damages resulting from its breach.

## D. Superseding Contract

 In the preceding section, we held that the district court correctly determined that the 1995 WAC CBA was a valid obligation of both the Union and Contempo, an obligation which the Union breached. We now address the Union's alternative contention that the Contempo CBA, although the product of the Union's breach, constituted a valid superseding agreement.

The district court determined that, by entering into the Contempo CBA, Contempo did not waive any rights under the 1995 WAC CBA. Nor did it waive any damages stemming from the breach of that contract. In the district court's view, the Contempo CBA did not supersede the 1995 WAC CBA because the Contempo CBA was the direct and proximate result of the breach of the 1995 WAC CBA. Contempo had a choice of damages, and it chose to minimize its damages by entering into a new CBA. *See Eazor Express, Inc. v. International Bhd. of Teamsters*, 520 F.2d 951, 969–71 (3d Cir.1975) (holding that an employer is under no duty to minimize its damages by entering into a new collective bargaining agreement when the union has struck in violation of a no-strike provision in the original collective bargaining agreement), *rejected on other grounds by Max's Seafood Cafe v. Quinteros*, 176 F.3d 669 (3d Cir.1999).

We believe that the district court was on solid ground in its determination that the Contempo CBA did not supersede the 1995 WAC CBA. There was simply no new consideration for the Contempo CBA because the matter at issue between the parties was already governed by the earlier CBA. This concept, basic to all contract law, was employed in a most graphic way in the labor relations context in *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir.

1902). In *Alaska Packers*, the owner of a salmon cannery contracted with a group of men to work as sailors and fishermen. The men were expected to travel from San Francisco to Alaska and return. In exchange, the owner would pay them, depending on when they contracted, $50 or $60. However, once they reached the port in Alaska, "they stopped work in a body" and demanded $100 for their services while threatening to stop work entirely and return to San Francisco if they were not paid the higher sum. *Id.* at 101. At that time, it was impossible for the owner to find replacement workers because the port was remote and the season was short. After three days, the superintendent of the ship yielded to the workers' demand and agreed to pay the $100. The workers finished their job, but on return to San Francisco, the owner of the ship refused to pay them more than stated in their original contracts. *See id.* at 100–01.

 The Court of Appeals for the Ninth Circuit held that consent to the workers' demand, while in remote waters during a short season and with a large sum of money invested in the venture, was without consideration because the new agreement was based solely on the workers' rendering the services they were already under contract to provide. *See id.* at 102. They breached their obligation and were liable to the owner in damages; the owner did not *voluntarily* waive the breach of the original contract by entering into the new contract when the workers took unjustifiable advantage of the necessity of the ship owner in order to gain greater compensation for themselves. *See id.* In the course of its decision, the court relied upon several cases in which one party breached a contract by stopping work at a time when the other party had a need for immediate completion of the work or for the particular services for which he had contracted.[8] In those cases, the brea-

---

8. *See Alaska Packers'*, 117 F. at 102–04 (citing *King v. Duluth, M. & N. Ry.*, 61 Minn. 482, 63 N.W. 1105 (1895); *Lingenfelder v. Wainwright* *Brewery Co.*, 103 Mo. 578, 15 S.W. 844 (1891); and *Cobb v. Cowdery*, 40 Vt. 25 (1867)).

chor was liable for damages stemming from his breach, and, according to the court, if the non-breaching party had entered into a new contract with the breachor, he could still show that the new contract was made without consideration and was thus a "nudum pactum."[9] Indeed, the basic requirement that a contract needs consideration to be enforceable has a distinct function in this area of contract modification, a function very important in a case such as this one: to prevent coercive modifications. *See United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1121 (7th Cir.1990).

 We must focus then on whether there was any new consideration for the Contempo CBA. In our search for such consideration, the pre-existing duty rule must govern our inquiry. The pre-existing duty rule states that promising to perform a duty that already is owed under an existing contract is not consideration, and, thus, a modification to the contract is unenforceable. *See* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.21, at 497 (2d ed. 1998). Two exceptions to the preexisting duty rule are recognized. The first is for the promisee to undertake to do something in addition to what he already is obliged to do under his preexisting duty. *See id.* at 500. If additional consideration is given then the modification is valid.

 The second is for the parties to agree to rescind the original contract, which allows them to create a different contract on entirely new terms, without providing additional consideration. *See id.* at 501. "In theory, this must leave both parties with at least an instant of freedom, during which they are no longer bound by the old contract and are under no duty to make a new one." *Id.* This exception needs to be approached with great caution. In *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89 (5th Cir.1995), the court, in nullifying a modification, distinguished between the modification of a contract and the rescission of an old contract with entry into a new contract. *See id.* at 93. Although recognizing that the latter concept does not require consideration, the court stated that, "where an alleged rescission is coupled with a simultaneous re-entry into a new contract and the terms of that new contract are more favorable to only one of the parties, doubt is created as to the mutuality of the agreement to rescind the original contract." *Id.* at 94.[10]

9. Although the exact scenario in *Alaska Packers* has not been presented to this circuit, the principles announced in it have been confirmed by us. For example, in *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118 (7th Cir. 1998), we discussed how, if an employee is bound contractually to remain in the employ of his employer and the employer promises a bonus to induce the employee to remain, then the modification of the contract is unsupported by consideration and thus unenforceable. *See id.* at 1122. Similarly, in *Selmer Co. v. Blakeslee–Midwest Co.*, 704 F.2d 924 (7th Cir. 1983), we stated that when one party refuses to honor a contract in order to force the other party to surrender his rights, even though nothing has happened to require the modification, it undermines the institution of contract and is unenforceable. *See id.* at 927. *See generally Rissman v. Rissman*, 213 F.3d 381, 387 (7th Cir.2000) (referring to Alaska Packers as the classic case of a contract modification procured under duress); *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 579 (7th Cir.1997)

(citing *Alaska Packers* with approval to support the use of the concept of duress); *United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1121–22 (7th Cir.1990) (using *Alaska Packers* to support the concept that a contract modification without additional consideration is not valid).

10. The following cases are examples of how courts have approached these exceptions to the preexisting duty rule. This court in *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir.1986), determined that conditioning an additional benefit on a contract modification was sufficient consideration to support the contract modification. In that case, American Hospital Supply conditioned additional loans to Hospital Products, which was financially distressed, on Hospital Products' agreement to modify the contract in American Hospital Supply's favor. *See id.* at 599. As the court concluded, "There is nothing unlawful about offering a benefit to a promisee in exchange for a modi-

In this case, there clearly was no new undertaking by the Union in return for the new CBA. Nor can it be said that there was mutual rescission of the 1995 WAC CBA by Contempo and the Union. Viewed in its starkest terms, the Union simply repudiated that agreement and left Contempo with no framework upon which to conduct its future dealings with the Union. There is no doubt in those circumstances that Contempo did not voluntarily agree to rescind the 1995 WAC CBA. Even if we characterize more charitably the Union's conduct in striking Contempo, the record simply will not support the conclusion that the parties entered freely an agreement to rescind the earlier con-tract; the Union's strike gave Contempo no choice but to acquiesce in the replacement of the 1995 WAC CBA with the new CBA as the framework for its ongoing labor relations. *See* 1 *Farnsworth on Contracts* § 4.24, at 478. As the district court noted, the strike breached the original agreement and placed Contempo in a perilous financial situation. Under these circumstances, it cannot be said that Contempo's agreement to enter into a new contract in order to end the strike operated as a free and voluntary rescission of the 1995 WAC CBA.[11] Given this lack of mutuality, the 1995 WAC CBA cannot be characterized as having been freely rescinded.[12]

fication of the contract; the problematic modifications are those not supported by consideration." *Id.*

In *Awe v. Gadd*, 179 Iowa 520, 161 N.W. 671 (1917), the parties entered into a written contract but the plaintiff claimed that they had agreed subsequently, in an oral contract, to different terms, which benefitted only the plaintiff. The court asked first whether the parties had rescinded, by mutual agreement, the written contract but determined that the record did not support such an action. *See id.* at 673. The court inquired next whether the plaintiff had promised additional consideration to the defendant for the benefit he was to receive by the modification. *See id.* Finding that the plaintiff did not undertake any new obligation under the contract, the court held that the plaintiff had provided no new consideration, and the modification therefore was invalid. *See id.* at 673–74.

Similarly, in *Recker v. Gustafson*, 279 N.W.2d 744, 753 (Iowa 1979), the parties reached an oral agreement wherein the Gustafsons agreed to sell 155 acres of their land to the Reckers at a set price. The agreement included the right of the Reckers to buy, at a fixed price, an adjoining tract of land containing a house and several buildings. After receiving the Reckers' down payment, the Gustafsons elicited a second oral agreement from the Reckers to pay an additional $10,000 for the 155 acre tract and, although retaining the right of first refusal, the price for the adjacent land was no longer fixed. To induce the Reckers to agree to the additional terms, the Gustafsons stated that they were willing to go to court to extricate themselves from the original agreement and that litigation was costly. Given that no new circumstances had prompted the Gustafsons' demand for more money, the court held that the lack of addi-tional consideration from the Gustafsons prevented the second agreement from being valid. *See id.* at 759. The court rejected the use of rescission, when the result was effectively a modification of the existing contract, to allow new terms to be added to the contract with no additional consideration provided by the promisee. *See id.* at 758.

11. As the Restatement (Second) of Contracts § 175 states, "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." The commentary to this section rejects requiring that the threat "arouse such fear as precludes a party from exercising free will and judgment or that it must be such as would induce assent on the part of a brave man or a man of ordinary firmness." *Id.* at § 175 cmt. b. Such a foundation was omitted, continues the commentary, because of its "vagueness and impracticability." *Id.* The threat must, however, leave the victim with no reasonable alternative. *See id. See also* 1 *Farnsworth on Contracts* § 4.16, at 478.

12. The dissent's reliance on *Richards Construction Co. v. Air Conditioning Company of Hawaii*, 318 F.2d 410 (9th Cir.1963), is therefore misplaced. As the court in that case emphasized, there was a dispute between the parties that was settled, by mutual agreement, in a new contractual undertaking. The court found that the contractor, by giving up the position that there was already a binding contract, gave new consideration. The subcontractor gave up its position that it was under no duty to the contractor. *Id.* at 414. Here, Contempo never gave up its rights under the 1995 WAC CBA and, in fact, explicitly preserved during the negotiations its right to sue.

Respecting the district court's finding that the Contempo CBA was the product of the Union's illegal strike, which violated the 1995 WAC CBA, we must conclude, on this record, that the Contempo CBA was without consideration because the Union undertook no new obligations. Nor can it be said that the parties freely rescinded their existing obligations before entering into the new agreement. The new contract was induced by the Union's decision not to honor the preexisting legal obligation of the 1995 WAC CBA at a time when, according to the district court, Contempo had no reasonable alternative but to acquiesce to the Union's demands. Therefore, we hold that the Contempo CBA did not supersede the 1995 WAC CBA.

## E. Damages

### 1.

■ In determining the amount of damages to which Contempo is entitled for the Union's breach of the "no-strike" provision in the 1995 WAC CBA, the district court correctly took as its guiding principle that the appropriate measure of damages was the "actual loss sustained by the plaintiff as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such a breach at the time the agreement was made." R.72 at 290. The court explained that, because the parties contemplated only compensatory damages as a consequence of a breach of the no-strike provision, Contempo may recover only compensatory damages. Because the goal was to make Contempo whole, the court focused upon what the situation would have been if the strike had not occurred. The court first determined that Contempo's employees would have worked for two days and produced two-

days worth of product. Because they did not work for two days and did not produce the product, they needed to work overtime to "catch up." The cost of catching up, as stipulated by the parties, was $11,574.48.[13] The court therefore awarded Contempo $11,574.48 in damages. This amount is not disputed by the parties.

The court next determined that Contempo had sustained costs stemming from the Contempo CBA which it would not have incurred but for the Union's illegal strike. The court found that, because of the illegal strike, Contempo was placed in financial peril. The industry, according to the court, is time sensitive. At the time of the strike, Contempo was in a situation in which it potentially could obtain a multiyear, multimillion dollar contract with Bank of America to construct minibanks in shopping malls; the strike placed this opportunity in jeopardy. Contempo's options, when faced with the strike, were to allow the strike to continue and possibly to lose the Bank of America contract with a potential loss of millions, or to sign the Contempo CBA to end the strike with a loss that turned out to be less than half of a million. According to the court, Contempo reasonably decided to minimize the damages from the Union's breach of the 1995 WAC CBA and, to achieve that goal, Contempo agreed to the Contempo CBA. But for the illegal strike, the court concluded, Contempo would not have entered into the Contempo CBA and, therefore, would not have incurred additional expenses over the costs in the 1995 WAC CBA. Thus, the court determined, Contempo's compensatory damages included its additional costs due to the Contempo CBA.

13. Included in the $11,574.48 is the expense of two days wages which Contempo would have had to pay its employees even if no strike had occurred. The court therefore deducted $7,602.40 as the cost of two regular days of wages; however, because the Union required Contempo to pay its employees their wages for the two days of the strike, the court added back in the amount of wages for two days—$7,602.40. Thus, the court determined that $11,574.48 was the proper amount of damages due to Contempo for it to catch up for the days lost due to the strike.

In a breach of contract action under § 301 of the LMRA, damages should place the aggrieved party in the position it would have been in had the breach, i.e., the strike, not occurred. *See Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Karr Bros.*, 755 F.2d 1285, 1290 (7th Cir.1985). The Union submits that the district court should have awarded only the expenses incurred by Contempo in catching up on work missed during the strike. It was error, the Union argues, to award damages for the wage and benefit differential between what Contempo had to pay under the Contempo CBA and what it would have paid under the 1995 WAC CBA. It asserts that the wage and benefit differentials were not a direct result of the breach of the no-strike provision in the governing 1995 WAC CBA.

Contempo responds that the Contempo CBA was a direct and proximate result of the illegal strike; Contempo would not have entered into the Contempo CBA had the strike not occurred. Therefore, submits Contempo, the wage and benefit differentials are recoverable. Such an award is necessary, Contempo claims, to put it back in the position in which it would have been if the strike had not occurred. Given that the Union has not challenged the district court's factual finding that, but for the illegal strike, Contempo would not have entered into the Contempo CBA, let alone demonstrated that the finding was clearly erroneous, *see Eirhart v. Libbey–Owens–Ford Co.*, 996 F.2d 837, 842 (7th Cir.1993), Contempo asserts that the district court's damages award should not be disturbed.

### 2.

According to the Restatement (Second) of Contracts § 347, an injured party is to be placed in as good a position as he would have been had the contract been performed.[14] This is a well-established principle in the field of contract damages. *See, e.g.,* 3 *Farnsworth on Contracts* § 12.8, at 188–89 ("One is entitled to recover an amount that will put one in as good a position as one would have been in had the contract been performed."); 5 Arthur Linton Corbin, *Corbin on Contracts* § 992, at 6 (1st ed. 1964) ("The effort is made to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.").

This rule on damages applies in the labor context. If one party breaches a collective bargaining agreement, the injured party may recover damages; if the union strikes "in violation of the contract, the company is entitled to its damages." *Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers Int'l*, 370 U.S. 254, 266, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). Under § 301 of the LMRA, "breach of contract damages should place the aggrieved party in the place he would have been in had the breach not occurred." *Chicago Painters,* 755 F.2d at 1290.

Before recovering damages, an injured party must demonstrate that the damages are foreseeable, certain, and no-navoidable. Only foreseeable damages are recoverable for a breach of contract, *see Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 958 (7th Cir.1982), and the foreseeability of damages is considered at the time the parties entered into the contract, *see* Restatement (Second) of Contracts

---

14. An injured party is allowed to recover compensatory damages for a breach of a contract. The amount of compensatory damages is generally equal to (1) the net amount of losses caused by the breach *plus* (2) the gains prevented because of the breach minus (3) the savings made due to the breach. *See* 5 Arthur Linton Corbin, *Corbin on Contracts* § 992, at 6 (1st ed. 1964). Thus, damages = losses caused + gains prevented − savings made.

§ 351. The question asked is whether a reasonably prudent person in the position of the breaching party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of this type of breach. *See id.; see also W.L. Mead, Inc. v. International Bhd. of Teamsters*, 129 F.Supp. 313, 317 (D.Mass.1955) (stating that business loss is a natural and foreseeable consequence of an illegal strike to anyone acquainted with the business). Thus, in the context of this case, we must ask whether a reasonably prudent person in the position of the Union, at the time it entered into the 1995 WAC CBA, would have contemplated as a natural consequence of violating the 1995 WAC CBA's nostrike provision, that an employer would yield to the pressure of the illegal strike and enter into a new collective bargaining agreement. Considering that the purpose of a strike is to force an employer into acceding to the demands of the Union, it certainly is reasonable to conclude that the Union would have foreseen, when it entered into the 1995 WAC CBA, that an unlawful strike could coerce an employer into entering into a new CBA. Thus, damages related to a new CBA as a result of an unlawful strike were foreseeable to the Union at the time it entered into the 1995 WAC CBA.

■ Next, we consider whether the damages are certain. Under § 301, the measure of damages recoverable for a breach of contract is the actual loss sustained as the direct result of the breach. *United Elec., Radio & Mach. Workers v. Oliver Corp.*, 205 F.2d 376, 388 (8th Cir. 1953); *cf. Gulf Coast Bldg. & Supply Co. v. International Bhd. of Elec. Workers, Local No. 480*, 428 F.2d 121, 125 (5th Cir.1970) (stating that damages under § 303 of the LMRA may be recovered only for actual losses sustained as a result of the breach); *Sheet Metal Workers Int'l Ass'n, Local Union No. 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109 (5th Cir.1967) (same). Contempo therefore must prove the fact of

damages before recovering. *See George E. Hoffman & Sons, Inc. v. International Bhd. of Teamsters*, 617 F.2d 1234, 1247 (7th Cir.1980). " 'The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain.' " *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (*quoting Taylor v. Bradley*, 39 N.Y. 129 (1868)). Performance by the Union under the 1995 WAC CBA would have meant that the strike would not have occurred. But for the illegal strike, Contempo would not have incurred losses for the days its employees were not working and Contempo would not have entered into the new CBA. *See W.L. Mead, Inc.*, 129 F.Supp. at 317 (using "but for" test to calculate losses due to an illegal strike). Thus, as the district court held and the parties do not dispute, Contempo is entitled to its catch-up costs. Additionally, as the district court held, but for the strike, the 1995 WAC CBA would have remained the operative contract between Contempo and the Union. Thus, whatever would put Contempo in the position it would have been under the 1995 WAC CBA before the strike is the appropriate measure of damages Contempo is entitled to receive. Because Contempo would not have entered into the Contempo CBA but for the illegal strike, these damages related to the Contempo CBA are the certain and direct result of the Union's breach.

Finally, we ask whether these costs incurred by Contempo were avoidable. At the time of the Union's illegal strike, Contempo was faced with two options: (1) to not sign the new CBA, which would cause it to accumulate losses for each additional day of the strike and which could cause it to lose the multimillion dollar contract with Bank of America; or (2) to enter into the new CBA.

■ An employer is under no duty to minimize its damages by entering into a new collective bargaining agreement when

the union has struck in violation of a no-strike provision in the original collective bargaining agreement. *See Eazor Express, Inc. v. International Bhd. of Teamsters*, 520 F.2d 951, 969–71 (3d Cir.1975).[15] As *Eazor Express* explains, " 'One is not obligated to exalt the interests of the defaulter to his own probable detriment.' " *Id.* at 971 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 199 (3d Cir.1950)). By entering into the new CBA, however, Contempo limited its damages to the difference in contract prices and to costs for each day in which the strike already had occurred. Thus, Contempo made a reasonable effort to limit its damages by entering into the new CBA.

Whether an available alternative transaction is an appropriate substitute depends on many factors, including the similarity of the performance that the injured party will receive and the times and places at which they would be rendered. . . . If the party in breach itself offers to perform the contract on terms less favorable to the injured party, this may nevertheless be an offer of an appropriate substitute.

3 *Farnsworth on Contracts* § 12.12, at 240–41. This concept applies in the labor context. When a union strikes illegally, the employer usually has no alternative source for a substitute other than the breaching union. Thus, the employer either may wait out the unlawful strike and then recover damages or may enter into a new contract with the striking union. Here, as the district court found, Contempo, faced with financial difficulties, had no choice but to enter into the new CBA.

The difference in costs to Contempo between the 1995 WAC CBA and the Contempo CBA is the amount that would put Contempo in the same position as it would

have been if the 1995 WAC CBA was still the operative contract. We can calculate exactly the amount of harm caused by the Union's illegal strike by comparing the costs to Contempo under the 1995 WAC CBA and the costs to Contempo under the Contempo CBA. The difference in costs to Contempo is $433,139.39. Therefore, Contempo is entitled to recover $11,574.48, which is the amount Contempo expended to catch up after the illegal strike, and $433,139.39, which is the difference in costs to Contempo between the 1995 WAC CBA and the Contempo CBA.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

TERENCE T. EVANS, Circuit Judge, with whom Circuit Judges ILANA DIAMOND ROVNER, DIANE P. WOOD, and WILLIAMS join, dissenting.

There are a few flaws in the formation of a contract that make it void from the get-go, including duress, lack of consideration, mutual mistake, misrepresentation, and the mental incompetence of a party. The majority jumbles this list by disguising what really is a finding of duress in lack-of-consideration's clothing.

Duress, where one side acts in bad faith to gain an unfair advantage over the other, is the most likely contract-killing doctrine to apply to the new CBA that Contempo and the Union reached on March 6, 1996, ending the Union's 2–day strike. The Union did not hold a gun to the heads of Contempo's negotiators or twist their arms, so we are here talking only about economic duress. In Illinois,

---

15. If the employer waits out the strike, it may recover any reasonably justified expenses expended to minimize the damages due to the strike. *See Frito–Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters*, 623 F.2d 1354, 1364 (9th Cir.1980) (allowing the injured employer to recover salaries, which it paid to

clerical workers who were maintained as standbys for the resumption of normal operations, and bonuses, which it paid to management to induce them to stay, as a justifiable expense incurred in order to minimize the damages caused by the strike).

[e]conomic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable.... To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract."

*Resolution Trust Corp. v. Ruggiero,* 977 F.2d 309, 313 (7th Cir.1992) (quoting *Alexander v. Standard Oil Co.,* 97 Ill.App.3d 809, 53 Ill.Dec. 194, 423 N.E.2d 578, 582 (1981)). The critical issue in duress is not so much whether the decision was rational or voluntary given the immediate circumstances, but rather "whether the statement that induced the promise is the kind of offer to deal that we want to discourage, and hence that we call a 'threat.'" *Selmer Co. v. Blakeslee–Midwest Co.,* 704 F.2d 924, 927 (7th Cir.1983). *See also United States v. Stump Home Specialties Mfg., Inc.,* 905 F.2d 1117, 1122 (7th Cir.1990) ("The sensible course would be to enforce contract modifications (at least if written) regardless of consideration and rely on the defense of duress to prevent abuse. All coercive modifications would then be unenforceable, and there would be no need to worry about consideration, an inadequate safeguard against duress." (citations omitted)).

There is no question here that the Union had Contempo over a barrel. The exhibit/display business is time-sensitive, and the Union struck just as Contempo was negotiating a multiyear, multimillion-dollar contract to build minibanks inside Chicagoland grocery stores for Bank of America. But striking at an inopportune time for the employer is a familiar and hard-nosed union tactic, not an unfair one. The parties and the district court agreed that a major issue at trial would be whether the new CBA was void *ab initio* because Contempo signed it under duress. After considering all of the evidence, the district judge decided that Contempo did not act under duress

because it was not "bereft of the quality of mind essential to making the contract" with the Union in March 1996. I see no reason to quarrel with this determination, a finding of fact that deserves deference. "Duress is not shown by the fact that one was subjected to ... a difficult bargaining position or the pressure of financial circumstances." *Ruggiero,* 977 F.2d at 313. Contempo's officials were between a rock and a hard place, and they made a rational, calculated economic decision not to fight the Union. Instead, they entered into a new collective bargaining agreement that would ensure their ability to pursue the Bank of America contract.

In allowing Contempo to back out of that decision, the majority relies on *Alaska Packers' Ass'n v. Domenico,* 117 F. 99 (9th Cir.1902). In that classic case of duress, the workers "willfully and arbitrarily" broke a clear obligation to work for a certain wage and coerced a better deal out of their employer, who at the time had no alternative but to accede to their demands. *Id.* at 102–03. In *Alaska Packers* there was no doubt that a valid contract was in place and there was no doubt that the employees acted in bad faith.

Things were not so clear in this situation in our case. There is little evidence that the Union acted in bad faith when it struck Contempo in March 1996. The issue of whether the June 1995 Woodworkers Association CBA, including its no–strike clause, applied to Contempo was hotly contested at the time of the strike. Indeed, the state of affairs was so convoluted that Contempo itself initially thought that the latest CBA between the Woodworkers Association and the Union did not govern the company's relationship with the Union. Contempo and the other hard card employers began negotiating a new CBA with the Union on June 14, two weeks *after* the latest CBA between the Woodworkers Association and the Union had gone into effect on June 1. Those negotiations continued for a month, until it dawned on Contempo on July 17 that a new CBA

might not be necessary because the hard card agreements binding the Union and Contempo to the latest CBA still were in place.

Though I agree with the majority that Contempo and the Union were bound by the CBA that went into effect on June 1, this hardly was crystal clear at the time. The space the *en banc* majority (as well as the original panel) devotes to establishing that the June 1 CBA was binding on Contempo and the Union indicates that the Union's position that it was not bound was far from frivolous. At the time the strike occurred and the new CBA was reached in March 1996, there was significant uncertainty as to whether the June 1995 CBA was binding. The Union's decision to strike at a moment of extreme vulnerability for Contempo constitutes tough bargaining, not bad faith.

Those factors make this case less like *Alaska Packers* and more like *Richards Construction Co. v. Air Conditioning Co. of Hawaii*, 318 F.2d 410 (9th Cir.1963). This more contemporaneous Ninth Circuit decision distinguished *Alaska Packers* from a situation where the two parties have a genuine dispute over whether a preexisting contract is in place. Much as in our case, the *Richards* court noted,

[A]lthough it is now established, after a trial in which the court had to sift much conflicting testimony, that appellee's bid did ripen into a contract, it was by no means as clear, at the time, that there was such a contract. Appellant maintained that there was, appellee maintained, just as firmly, that there was not. The subsequent negotiations ... are consistent with the idea that appellant was not at all sure that it had a binding contract, however firmly it asserted that position.

*Id.* at 413.

Likewise, the uncertainty as to whether a contract already existed means that there was consideration for the new contract negotiated between Contempo and the Union in March 1996. *Richards* again is instructive:

[W]hat happened, in substance, was a mutual surrender, by the parties, of their antithetical positions, in exchange for a new, formally executed, complete and binding contract.

We need not, and do not, apply the rule applied in certain cases cited by the trial court, to the effect that a party to a contract has a choice, when confronted by a naked demand for more money, between rejecting the demand and suing for his damages, or assenting to the demand, in which case he will be bound. We rejected this idea in *Alaska Packers*. The differentiating factor here is that there was a dispute as to whether appellee was bound. A settlement of that dispute involves the giving of new considerations by both parties.... Generally speaking, a contract to settle a genuine dispute is binding; the law favors such contracts; this was such a contract.

*Id.* at 414. In the new pact, both sides got something—the Union gained modest wage and benefit increases for its members and Contempo won an end to the strike and to the uncertainty over whether a contract was in place. That's consideration.

This case swings on whether the Union improperly coerced Contempo into signing the second contract under economic duress. If there was duress, then that contract is void and Contempo is entitled to the $433,139.39 difference between the first and second contracts. Without duress, the second contract is legally valid and the company's damages should be limited to the $11,574.48 in costs for the illegal 2–day strike. The district court did not find duress and neither does the majority—yet today's opinion wipes out the second contract anyway. Extinguishing the second contract on the ground of lack of consideration is a mistaken and roundabout way to let Contempo out of its agreement even though it did not act under duress. Erasing the second contract

as a remedy for the breach of the first contract is a confusing, novel, and open-ended reason for voiding a contract. It is also unfair. We respectfully dissent.